May it please the Court, I'm Sandra Ferguson, I'm here pro se today. And I'm very grateful that the Court issued an order several days ago, telling us what issues it would like us to focus on in this argument, because there was a broad range of issues that were before the Court. So I'd like to just start by listing those issues. We were told to address whether Ferguson's claims under 42 U.S.C. 1983 were properly dismissed under the Noir-Pennington Doctrine by the District Court. My answer to that is no. The 1983 case should not have been dismissed under the Noir-Pennington Doctrine. I'd like to say one thing first. The District Court, as I understand it, held that it was dismissible under both Noir-Pennington Washington SLAP law and Washington Privilege Law. And we didn't ask you about Washington SLAP law because that was clearly wrong. We have, I just want you both to know that we have case law specifically saying that Washington SLAP law does not apply or state SLAP law does not apply to a federal action. So we are proceeding on that assumption and it has, may have consequences for the case. Go ahead. Thank you. So the answer to that question is no, the Noir-Pennington Doctrine, even if it is applicable to Mr. Wade's petitioning activities, which I don't necessarily concede, it, the sham exception to the doctrine should have been analyzed and applied. And the District Court provided no analysis on the issue of the sham exception, which I believe I did raise in my briefing. Issue number two that the court asked us to address is whether Ferguson adequately pleaded the requisite action to state a claim under Section 1983. My answer to that is yes. And if not, I should be, if the court finds that my pleadings are not sufficient, I would urge that I be permitted to amend the complaint upon remand. And three, the third issue was whether the privilege provided by Washington law under ELC 2.12 applies to a claim under federal law in federal court or has been or should be incorporated into federal common law. And I believe the answer under Wallace versus Spencer to the first part of that three-part question or issue is no. The ELC 2.12 should not apply to a claim under federal law in federal court. And part two of that question, whether it's been incorporated or should be incorporated into federal common law or has been, if I'm understanding the court's question correctly, and I'm a little fuzzy on it, but I believe that that is what the Noir-Pennington Doctrine and the case law that has grown from the doctrine, I believe that is the application of federal common law to the claim that Mr. Wade has a right as a petitioner, a First Amendment right. And I believe that the case law protects his right, but he is not absolutely immune. And this has been a very convoluted case. The background, I believe, is relevant to a discussion of whether or not the two-part test that the Supreme Court enunciated in PREI versus Columbia I believe that the background of my litigation with Mr. Wade is relevant and it is also fairly convoluted. So if the court has any questions about that background and what has preceded, you know, required us to be here today, I would like to have the opportunity to answer that, but I will. Well, it seems to me that the main way that that comes in as the case is now structured is you are essentially saying that your answer to Norah Pennington is the sham exception and that involves some background information. So if you could tell us why you think the sham exception applies, that would be helpful. Okay. Well, I think the sham, if we are just isolating, what is the petitioning activity? I think, first of all, going back to whether his petitioning activity is protected at all under the Norah Pennington doctrine is a question for the court. I don't say with a great deal of confidence that he, that it might not be protected, but the fact that he, I'm sorry, I'm a little nervous. I'm losing my train of thought. But if we take what is his petition activity, first of all, if we're looking at his petitioning activity as only his complaints to the Washington State Bar Association about me, then that's one type of analysis. But if we're also looking at the other activity that he has engaged in throughout this litigation, then that's perhaps another branch of the analysis. What is that other activity? Well, okay. So initially, Mr. Wade represented me from, he began representing me in 2011, April 2011, in an underlying, actually two underlying cases. What was going on right then was that I had been the attorney for several years on my own in a civil rights case, an employment discrimination case, representing five female managers against the Safeway Corporation. And I was suspended from the practice of law after like several years of being under investigation by the Bar Association and appealing the matter to the Supreme Court. On February 3rd, 2011, I was suspended. Mr. Wade was not representing me at that time. I took my 90 days. And while I was away, I had a co-counsel handling the case. And before I actually was to return from my 90-day suspension, I became alarmed by some information I had. About what was happening. And I contacted Mr. Wade. And he advised me to immediately file a, based on the situation as I described it to him, he advised me to immediately file. I think that this, at least it's not illuminating me. I looked at the complaint in terms of what the complaint is about. And the complaint is specifically about the unlawful joint activity with WSBA officials to deprive Ferguson of her liberty and property. And that's what the complaint talks about. So you said something about other petitioning activity. And I don't, and it seems to me that's not in this case, whatever it is. Well, I think the other petitioning activity, other than filing the bar complaints, which, so Mr. Wade filed several, he filed a bar complaint against me. And then he filed several, he kept writing to the Bar Association and stating to them as a factual matter that I am mentally ill. And that I should be disbarred immediately, investigated and disbarred immediately. Prior to that complaint that he does not deny he filed, there was an anonymous complaint that was filed. And that anonymous complaint was comprised only of a declaration that I had submitted during our litigation. My litigation... The question is, how does this hook up to the sham exception? Right. Well, it's whether you define, I think the analysis depends that we apply under the PREI case, depends on whether you look at this as one act that he did of filing a bar complaint against me, or whether you look at it as repetitive harassing activity. And I know that I'm the one that the district court found to have been the harassing party here. But that is not the case. As a factual matter, in addition to the fact that he filed these bar complaints and then continued to correspond with the bar officials, telling them that I am mentally ill and urging them to disbar me immediately. He also in our litigation, he initially on December 1st of 2015, he insisted that my lawsuit against him in state court be dismissed without prejudice. And I opposed that because I wanted to go to trial. I wanted my jury trial. I wanted my day in court. And that is all that I have ever wanted is my day in court. Counsel, before you finish your argument, at some point, because a lot of what you've talked about is Nora Pennington. Could you explain your theory of state action? How can you have a 1983 claim against the defendant Wade? Um, because my allegation is that the defendant Wade initiated maliciously and based on false information, he initiated this complaint with the Bar Association and he followed up by continuing to urge them to disbar me. And the reason that he did that was so that I would not get my day in court in the state court case. I would not. That characterization of your complaint seems to run quite against any state action. And why do you say that? Because you're saying that the problem is that he went to the state bar and he had reasons to be attacking you and so on. But what does that have to do with state action? What's the, what does the Washington State Bar have to do with the whole thing? Well, his complaint was meritless, objectively meritless. And the Bar Association, um, if they had not been a participant in this, um, effort to target me, um, they would have dismissed the complaint. Well, at least they first investigated it and decided whether it was meritless. What did they ultimately decide? They haven't decided. I'm still under investigation. I'm like, uh, it's something in a Franz Kafka novel. I'm waiting for the sentence, but I don't know what the crime is. So I've been 15, they've investigated me for 18 months. And then it was only when Mr. Wade asked them to, uh, to defer the investigation, um, after I filed a complaint against him, that the Bar Association immediately, uh, granted his request to defer. And then to give the appearance that there was fairness, uh, that they were treating us fairly. They also, at that time, after 18 months of investigation, they also deferred my claim, my, uh, the investigation against me. They had been investigating me for 18 months before that. Can I ask you a question? Yes. If his claims are meritless, why did the state's investigation take 18 months? Do you know? Um, that's, that's why I'm alleging that there is a conspiracy between, no, I do not know. I see. Nobody could reasonably explain that. And I, I look to the, um, there's a case that sounds very much like mine, uh, factually, um, which, uh, is a Ninth Circuit case. And it involved HUD, um, HUD, uh, HUD defendants. Um, shoot, what's the name of it? Um, White versus Lee or Lee versus White, um, where, uh, some citizens, a group of citizens were engaged in pamphleteering and, uh, they filed a lawsuit. Um, and they were attempting to prevent a housing, um, a hotel from being converted into, uh, a residential place for mentally ill or the homeless. And, um, the, um, opposing side who wanted to build the housing, uh, filed a complaint with HUD for discrimination under the FHA. And, uh, the FHA, uh, agents in San Francisco, the local agents, um, investigated for eight months or something. And, um, the court said that that was unreasonable and that that chilled the First Amendment rights of these, um, of these, uh, citizens who were protesting, um, the housing, the, the, the action. And, um, the citizens also filed a lawsuit in state court. Um, and the court found that their lawsuit was not meritless and therefore, you know, the activity of HUD, even though, uh, the, the agents had not, um, eventually taken action against, uh, the, um, the citizens, uh, they did, they kept this investigation going for an unreasonable amount of time. And the court said, if you, you know, if we don't just look at whether they, they prosecuted these people, we, there are other things that can chill speech, intimidation, tactics, and, uh, you know, um, even if the agency never takes the action that is threatened. And based on my prior, I don't, I don't know, um, you know, there's quite a lot of, of information in the record about my prior experience with the Bar Association. But the Bar Association is not, doesn't fall neatly into a category of state agency, uh, as some agencies would or as an executive agency. It, it's a hybrid. It's a sui generis, if you will. Um, it's partly a, a club, an association. And those who participate in that club, um, who are at the center of it are, um, appear to be decision makers sometimes and appear to be having an effect on what happens when a complaint gets filed against an attorney, uh, as I believe occurred, was occurring in my case, um, after Mr. Wade, uh, filed this complaint. With regard to the sham exception, have you alleged in your complaint or could you allege in your complaint, um, what I understand to be the requisite for that, which is, um, that the use of the government processes as opposed to the outcome was a mechanism to injure you? In other words, the, the fact that I, I, have you or could you, um, allege that simply having this bar charge pending, um, for as, uh, has, has injured you? I have and I could and I did. I alleged all those things in my complaint at great length. What are the allegations? Um, the allegations are that, and I, and I wrote to the Bar Association and I told them this. So when the first, uh, complaint was filed against me anonymously, it did not, there was no allegation. It was my declaration, my own declaration. And it arrived anonymously, the Bar Association, um, and under that case I just cited, I would say that... But so far, we don't have him hooked up to that. So it has to be the later stuff. Well, don't you have to accept, uh, my allegations in the completings as true on a, on a, uh, dismissal on 12B6? Go ahead. So there's, there, I have a basis for saying that this was Mr. Wade. Um, the circumstantial evidence is pretty strong. December 1st, the day that the, uh, the, um, complaint was sent in, the anonymous complaint, that was the same day, December 1st, 2015, was the same day that I refiled, uh, the lawsuit that Mr. Wade asked to be dismissed without prejudice. Um, and so then I received this notice from the Bar Association that I was under investigation. At the time that I responded to that, I notified them that I suspected that it was Mr. Wade and that he was improperly using the disciplinary process to burden me, knowing that I was doing a great deal, a great share of the work in the lawsuit against him. Um, and I did have representation in that case, but, uh, you know, he knew that, that being investigated would burden me. And if he did it anonymously, he wouldn't have to have a light shined on his own behavior because as my attorney, he engaged in criminal behavior. Okay, Ms. Ferguson, I apologize for interrupting you, but you're now three minutes, more than three minutes over the allotted time. If you look at that clock. Okay. That's how much you've exceeded your time. I've exceeded my time? By three minutes and seven. Okay. So you need to wrap up your argument so we can. Okay. Well, I do believe that the analysis here, um, as to whether or not the Noir-Pennington doctrine applies is that it most, it probably does apply and the sham exception certainly applies. And I do believe that I have pled the facts that support, um, Mr. Wade's abusive process, not only with the bar complaint that he filed, but using every tactic that he can to avoid and to delay my jury trial in, um, our state law litigation. That's what this has all been about for four years, is not letting, letting me have my jury trial. Thank you. Thank you, Ms. Ferguson. Now, next, we're letting the intervener argue for five minutes. Thank you, Your Honors. It's Eugene Wallach as amicus in support of neither party. Independently of the, of Ms. Ferguson's claims against Mr. Wade, there was a cross complaint by Mr. Wade for defamation, which led to an injunction being issued against Ms. Ferguson. This raises the perennial question, which has been bedeviling district court in, in this circuit, as well as courts throughout the country of when an injunction against libel is permissible. And one way of thinking about it is that under this injunction, it would be a crime for Ms. Ferguson to repeat certain statements that had been found to be libelous. The injunction, like all such anti-libel injunctions, operates as a mini-criminal libel law, just for this particular, particular speaker, and justice to these particular statements. Now, criminal libel statutes, if properly crafted, are indeed constitutional. The Supreme Court has said so in Garrison v. Louisiana and Herbert v. Lando. But this injunction, while in some respects narrower than a criminal libel statute, actually fails to provide some of the procedural protections that even criminal libel law would provide. One example- Justice, right, go on. It would be helpful to me if we could focus on the actual injunction and what you think would need to be changed and why. Yes, Your Honor. So the injunction says, in the parts that I'm most focused on in the brief, is Ms. Ferguson is enjoined from publishing, again, the same or effectively identical statements. So that is based on a finding by the district judge, by preponderance of the evidence, that her statements were false. Whereas in even a criminal libel persecution, there would need to be a proof beyond a reasonable doubt that those statements were false. So as a result, it's possible that Ms. Ferguson, if she were to repeat these statements, would end up in jail for allegedly libelous statements, even without any proof beyond a reasonable doubt that those statements were, in fact, liable. And that's in part because of the collateral bar rule. Because she would be unable at any criminal contempt proceeding, she would be unable to argue that the injunction was invalid. Once this judge, this one judge, makes the conclusion that these statements were false, she is forbidden unpayment of criminal punishment. And that's interesting because I would have thought that the more problematical sections would be A, particularly A, because it's not even talking about these statements, but contacting, talking to other people about other things. But as to B, where are you getting the assumption that the First Amendment requires the beyond a reasonable doubt proof of falsity? Your Honor, first, I agree that subsection A may, in fact, be even more problematic because it's overbroad. This was not the focus of my brief, although I'd be happy to speak to that if you wanted me to. So I think that this is what the court had been getting at when it had been talking about how prior restraints, injunctions are presumptively unconstitutional prior restraints. Why would there be a problem with an injunction against libel or against any other kind of unprotected speech when there is no such problem with criminal punishment for such speech? One reason is, at least my inference from the court's condemnations of prior restraints, is that they lack the procedural protections customarily offered even through the criminal justice process. One of them is the jury trial, which is not in play here. But another is the proof beyond a reasonable doubt. So if, indeed, the court is correct that there is something that is more troublesome about prior restraints, which the Supreme Court has set off, and although I acknowledge it has not elaborated the explanation for it, it has to be because of the procedural limitations of the injunctive process. And one of them is the lack of proof beyond a reasonable doubt. Well, it's also because once — I always thought it was because once people speak, they've spoken, the speech is out there, and punishment for it is a separate thing. And now there's a chill, obviously. But, I mean, this is why originally it wasn't so clear that libel law was covered by the First Amendment at all, because the notion — because it was retrospective. And, I mean, there are even — my recollection is state constitutions, they say something like, you know, people can say whatever they want, being responsible for the injury caused thereby. There is some underlying concept that the problem is not getting the speech out to begin with, not any consequences. Isn't — and obviously, New York Times versus Sullivan and its progeny push back at that to a degree, but there's still some notion with the prior restraint elevation that that's really the concern. Your Honor, the Supreme Court articulated in Kingsley Books versus Brown, an injunction in the threat of criminal punishment. Both tend to chill speech. And both of them also ultimately only operate after the speech is said, because even if an injunction is issued before initial publication, it's — it'll only be enforced after the initial publication unless there's, like, a seizure of the printing press. So — I mean, one of the problems I have with your argument is simply that I'm not clear what it is you want to be in the injunction. Why isn't this problem that you're pointing to something we take that would come up in a contempt proceeding? Your Honor, I think that if the injunction were changed to say Ms. Ferguson — Ms. Ferguson, excuse me, is enjoined from libelously punishing — publishing again, so that at the criminal contempt hearing, there would have to be a finding by a jury if there is a jury present. But in any case, beyond a reasonable doubt that the statement is libelous, and is libelous at the time it is made in case — But wouldn't that be an appropriate thing to worry about at the time of the — if I mean, you could easily read that in, and it seems to me to be a fair implication. I'm just wondering why it needs to be in the injunction. Your Honor, I think it's in part because of the collateral bar rule, that if Ms. Ferguson were to repeat this statement, then she would be acting on peril of the judge at the criminal contempt hearing saying, nope, all that needs to be proved is that you republish those same statements. I suppose, but she could come in and bring in Professor Volokh, and he could say, well, you can't read it that way, because if you did, we'd have constitutional problems, so you should read it as repeating it libelously. Your Honor, I appreciate that. And if that were to happen, that is what I would say at that hearing. But that would offer no assurance to Ms. Ferguson or to other enjoined parties that are in her position. Because then the question will be at the criminal contempt hearing, will the injunction essentially have this implicit term added to it? For injunctions, it seems to me especially important to have these terms be explicit, so that it is clear to the regulated parties exactly what it is that they could be thrown in jail for violating. Your Honors, my time is up. If there are no further questions. Thank you, Professor Volokh. Your Honors, Brian Waite on behalf of myself. And I'm not accustomed to be appearing on behalf of myself, but here I am. May it please the Court. Before I respond to the questions your Honors have raised and Ms. Ferguson's argument, I'd like to point out the kind of problem we're dealing with here. Ms. Ferguson just told you, oh, I'll finally have my jury trial. I thought I was, but if I'm not. Ms. Ferguson said, well, I'll finally have my jury trial. In Ferguson 1, the 2014 case, I requested the jury. Not Ms. Ferguson. And when it came time, she tried to persuade the Court to proceed on bifurcated days without a jury. And I declined. And that was the day when Ms. Ferguson showed up in court. Is this relevant to anything in this case? It is, your Honor. It's relevant in the sense that Ms. Ferguson is a stranger to the truth. And this is an example. I think we should argue the legal issues that we've asked you to argue. Your Honor, I'm really having trouble hearing you. I think that we should argue, I would prefer you argue the legal issues that are before us. But there are three points I want to make first. I do want to make a couple of factual points. Ms. Ferguson said the bar investigated her for 18 months. That's not true. The bar didn't proceed on that. She never responded to that. The March 1, 2016 letter, she has never responded to the merits of that. So she wasn't investigated for 18 months. And in the Caruso case, and I apologize, I should have brought it with me today. The complaint she filed in the Caruso case alleged that the bar had discriminated because they opened an investigation relative to her, but they ignored her disciplinary grievance against me. That was untrue. Ms. Ferguson later filed a declaration in the Caruso case in which she admitted that she simply hadn't opened her mail for a period of time. It would really be helpful if you would answer the questions as to whether there is a viable 1983 action. I will, your Honor. And, you know, I've been dealing with this for eight years, and that's probably why— You're not dealing with it very well now because you have an argument before us and you're not arguing. I promise you I'm going to get there. I promise you, your Honor. And this has been a rough eight years. I have been harassed. I didn't have anything to do with sending Ms. Ferguson's self-drafted, publicly filed declaration about her mental problems. I didn't have anything to do with that. Ms. Ferguson was the first person to alert me that the bar had opened an investigation. Right. Can I ask a specific question? Yes. So we can get the case on track, the argument on track. Okay. First of all, it is my understanding that the district court found Rule 11 sanctions against Ms. Ferguson, which resulted in a fee award. Is that right? That is correct, your Honor. And also $10,000 that came out of the Washington State slap case. Anti-slap case. Right. And unless you can tell me how that statute possibly applies, which I don't think it does, that much has to be reversed. Is that right? No, that's absolutely wrong. Really? Why? We have case law that specifically says that, and it's certainly logical, that Washington State doesn't decide what damages are available on a 1983 case. This isn't, that's not a 1983 issue. This is a 1983 case. Your Honor, I will address that. But, your Honor, you're conflating two different issues. 1983 is one issue. I'm going to get to that. The anti-slap statute was the state law counterclaim. There's nothing wrong with it. What was the claim? The claim was that the 1983 action was not a valid action. No, your Honor. That's not correct. The 1983 anti-slap statute counterclaim was based on the fact that Ms. Ferguson sued me for having filed a disciplinary, actually, I didn't file a disciplinary grievance. I merely cooperated with the state bars. My understanding is that... I'm sorry, I'd like to finish this. Pending investigation. So that's all I did. Now, I don't know how the 1983 could somehow preempt the anti-slap statute. But let me, if I could just, your Honor, nothing has happened to Ms. Ferguson. The state bar of Washington has a policy that as long as a grievant and an attorney are involved in a litigation dispute, that they defer the disciplinary matter. The bar has taken no action. If this was a conspiracy, your Honor, it was a singularly unsuccessful conspiracy. The bar has taken no action against her. And it isn't as though I haven't tried. Yes, I sent letters to the bar and they refused to proceed. I sent letters to the bar because Ms. Ferguson, not me, asked to defer matters and the bar agreed. So this idea of being investigated for four years is not consistent with the record. It just didn't happen because Ms. Ferguson requested deferral. And that's in the record. So, your Honor, in terms of immunity, and I obviously disagree. I think you're conflating two different things. But your Honor really addressed that in the Sosa case. In fact, what you did is you said you weren't going to address it in the Sosa case in footnote 3. And in that case, the question was whether the state court judgment on the anti-SLAPP case was res judicata as to the 1983 claim. And of course, I don't even think you get to Noor-Pennington because my conduct in cooperating with a bar investigation is immune under 1983. I mean, that's Voluma's case law to that effect. So I don't even think you get to Noor-Pennington. But let's assume you do. It can't be a sham, your Honor, for two reasons. First, we had a trial. Ms. Ferguson stood out in the hallway, but she had a lawyer there. And he cross-examined me. I was on the stand for most of two days. And we had a trial. About something else? About the truthfulness of her assertions against me. Right. Her factual allegations of how I'd been anything but a child of God. And those allegations. And the reason we went forward with that trial was because I wanted to have a trial. Ms. Ferguson talks about wanting to have a trial. She doesn't want to have a trial. Every time we have a chance, she disappears. So we wanted to have a trial. And I established with contemporaneous documentation under cross-examination that all these allegations she's making about me are categorically false. They've never been true. She makes them up. So, well, where does that leave us with Noor-Pennington? I thought the trial was about specific things that she said about you, which you managed to demonstrate she had not proven were true. Or you had not proven, you proved were false. What did I do with the rest of it? I don't know. Well, I'm trying to understand how a disciplinary grievance that's been proved correct. How has it been proved correct? Because all of the allegations that Ms. Ferguson made against me had been proven false. But can I just step back a moment, Your Honor? Let's stop a moment. Does this court want the federal courts to inject themselves in the first instance in a state court bar disciplinary proceeding, or any other professional disciplinary proceeding, before the bar or disciplinary body has even taken any action, any action whatsoever? What if you were to ask Ms. Ferguson, what's the defect in the Washington Bar Association process procedures? Sex discrimination? I don't think so. I believe right now all of the ODC lawyers are women. What is the defect in the process? There is no defect. The bar took no action. There is no deprivation. So under Noor-Pennington, does the court really want to say, we're going to determine whether that bar grievance was meritorious, or whether it was a sham? Well, actually, the case law says that's not what the sham doctrine's about. So it'd be nice if you addressed the actual doctrine. Well, I did address it in my brief, Your Honor. And I believe I addressed it very thoroughly in my brief. And just because Ms. Ferguson said it was a sham, that doesn't survive 12b-6. Specifically, Simmons v. City of Sacramento and Price v. Hawaii. And Your Honors, in Ms. Ferguson's prior case, the court already determined that the Washington State Bar Association procedures do not deny First and 14th Amendment rights. And the court recently, in the case involving the, I believe it's Gruber v. Oregon State Bar, reached the same conclusion. So I'm trying to understand here, for 1983 to apply, my understanding is, and I'll give you a For the deprivation must be caused by the exercise of some right or privilege created by the government or a rule of conduct imposed by the government. And that's a two-part test that's discussed in Collins v. Woman Care by this court. And the party charged with the deprivation must be a person who may fairly be said to be a government actor. The court adopted that test because 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrong. That's United, that's American Manufacturers Mutual, 526 U.S. reports 40. My concern, Your Honor, here is I don't care what basis Your Honors decide to affirm the dismissal of the complaint. Yes, but we do, is the point. I know you do. I know you do. And I appreciate that. And I'm trying to make a good faith argument because I must. But my concern is actually different. Does a person expose himself or herself to a 1983 lawsuit from the subject of the disciplinary investigation, such as Ms. Ferguson, simply by cooperating with that investigation? And yes, I did send some letters to the bar subsequently because Ms. Ferguson kept requesting deferral based upon the pending litigation. And I responded to that every time one of the Washington courts issued a decision terminating some aspect of that litigation. That has nothing to do with a conspiracy. So if a person is exposed in that manner, then how does this court propose to protect my First Amendment right, my First Amendment right to petition the disciplinary process without becoming subject to extortion by people like Sandra Ferguson? And make no mistake about it, she filed her disciplinary grievance a month after we declined her settlement overtures. And secondly, why would anyone cooperate with professional disciplinary authorities, let alone step forward to initiate disciplinary grievances in the future, knowing that they are then subject to being sued in the federal court? And how do you reconcile exposing an attorney who cooperates with a disciplinary grievance or a disciplinary investigation, exposing them to liability under 1983? And how do you reconcile that with the attorney's duty to cooperate under RPC 8.3a? The Washington State Bar Association asked me for information. They had an open investigation. I did my duty as I saw it, as an attorney, as an officer of the court. That's all I did. And with that, your honors, I do ask you to read my brief responding, a supplemental brief responding to Amicus. My concern is that this court not placed someone else in this same position. This has been years of harassment for Ms. Ferguson. My staff is instructed to call the police if she shows up, as is my wife. We are in fear of what she will do next. I ask the court to protect us. Thank you so much. Thank you, Mr. White. We appreciate the arguments of both pro se counsel, because we know this is an intense dispute. We appreciate that. And Professor Villok, we also appreciate your argument on the intention. With that, I use my rebuttal time up. You used your rebuttal plus four minutes. Go ahead. I'll give you one minute for rebuttal. But I'm not going to add more than a minute. We have our own problems on schedule. Okay, one minute of rebuttal. Okay. I did my best to, when I found out what the focus of the argument was, obviously, I disagree with the court's. I ask you to reverse the court's decisions denying my motions for summary judgment on the defamation claim and the civil harassment claim. But I didn't think that was supposed to be the focus today. So back to the application of the Noir-Pennington Doctrine, I believe that the case law instructs us that we're to look at the context, the impact of Mr. White's petitioning activity, the context in which it occurred, and the nature of the activity. The context here is a judicial proceeding. I think that's pretty clear. It's not lobbying. It's not, it's not, it is basically pre-judicial. It's like your Foro case, your Foro case that you decided that, you know, making a complaint to the police is a protected petitioning activity. However, I wanted to, you know, say that the sham exception still applies. Counsel, we've got your briefs. Okay. You're more than, your minute of extra rebuttal is done. Okay, I'm done. We've gone more than four minutes over it. I'm sorry, but we can't argue forever. Thank you. We can, we thank, we thank all counsel and the Ferguson versus Wade case shall be submitted and the parties will receive our decision in due course.
judges: Gould, Berzon, Benitez